JOSEPH H. HUNT
Assistant Attorney General
Civil Division
JOSHUA H. JOSEPH
Trial Attorney
U.S. Department of Justice
Torts Branch, Civil Division
PO Box 14271
Washington, DC 20044-4271
Tel: (202) 616-4030
Fax: (202) 616-4002
E-Mail: Joshua.H.Joseph@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERNEST W. HINSON, JR., | |
| *Plaintiff*, | HON. BRIAN R. MARTINOTTI |
| v. | *Civil Action No.* 18-870 (BRM) (LHG) |
| UNITED STATES OF AMERICA, | |
| *Defendant*. | |

## DEFENDANT UNITED STATES' TRIAL BRIEF

### I.        INTRODUCTION

This action arises from a ship engineer's trip and fall over a door sill (or "coaming")

while working on the DENEBOLA.  The DENEBOLA is a public vessel and cargo ship moored

in Baltimore, Maryland next to its "sister ship" the ANTARES.  The United States owns both

ships through the Department of Transportation's Maritime Administration (MARAD).  Tote

Services, Inc. manages both vessels under contract with MARAD.  The vessels, which are nearly

identical in design and layout, are part of MARAD's Ready Reserve Force, meaning they remain

at port and operate at a reduced status until called to service.  Plaintiff Ernest Hinson brings this

claim against the United States under the general maritime law, the Suits in Admiralty Act, 46

1

U.S.C. §30901, *et seq*. and the Jones Act, 46 U.S.C. § 30104, *et seq*.

The evidence will show that Hinson, an experienced seaman, inadvertently tripped over the coaming.  He was well aware of the coaming, but was distracted by a routine engine room alarm, and neglected to look down as he was stepping through the doorway.  Hinson knew that such coamings are quite literally everywhere on ships, including on the ANTARES and DENEBOLA.  It was simply his momentary distraction that caused him to fall.

Hinson blames the United States for not painting the coaming yellow.  The evidence will show that the coaming in question was clearly visible with the paint scheme it bore and that Hinson's fall was simply an unfortunate accident.

## II.   STATEMENT OF FACTS

On February 3, 2016, Hinson, a 62-year-old marine engineer with over 35 years of experience on cargo vessels, signed aboard the ANTARES as a Second Assistant Engineer.  In this role, he worked primarily in the engine room of the ANTARES and was responsible for the operation and maintenance of engine equipment and other machinery.  Throughout his career, Hinson routinely received instruction on maritime safety and hazard avoidance, including reminders about potential trip and fall hazards.

Though officially assigned to the ANTARES, on May 23, 2016, Hinson reported to the DENEBOLA to assist with a two-day "light off" or start up process, during which the ship's generators are started to ensure readiness for future activation.  The two ships were berthed side-by-side.  Hinson returned to the DENEBOLA on the following day, May 24, 2016, to complete the light off.  In the early afternoon, Hinson and another engineer were searching for water-testing chemicals in the DENEBOLA's engine room.  They entered an office in the corner of the engine room to look for the chemicals.



The base of the door separating the office from the rest of the engine room was comprised of a 30 inch wide coaming that was approximately 6 ¼ inches in height. The bottom portion of the coaming was a reddish color that matched the deck, while the top 1 ¼ inch was a contrasting off-white color. Although not watertight, the door was designed to prevent water from flowing into the office in the event of flooding. The coaming was the same width and height as the corresponding coaming on the ANTARES, where Hinson had worked for over three months. The parties agree that no regulations applied to the coaming that required it to be painted yellow or, for that matter, designated in any particular manner.



Hinson stepped over the coaming and entered the office without incident. Shortly after

entering, a routine engine room alarm sounded.  Hinson attempted to exit the office to investigate the alarm.  On his way out, he tripped over the coaming, fell forward, and landed on his right arm on the engine room floor outside the office.

After informing his Chief Mate about the incident, Hinson went to Medstar Hospital in Baltimore, Maryland and was diagnosed with an elbow contusion.  He was discharged with a prescription for ibuprofen and authorized to resume work.  Hinson returned to work the next day, but claims he continued to experience right arm pain, necessitating assistance with certain work activities.  About one month after returning to work, when Hinson sought further treatment, he was diagnosed with a tendon rupture in his right arm.  His doctor recommended surgical repair followed by a course of physical therapy.

Hinson left the ANTARES on July 7, 2016, the day after his diagnosis.  Following surgery in August of 2016, Hinson completed a five-month course of physical therapy that ended in May of 2017.  He has not had any injury-related treatment since completing physical therapy, but maintains that he continues to experience arm weakness and asserts he cannot return to work as a marine engineer or in any other capacity.  He has neither worked nor sought any type of employment since his discharge from the ANTARES.

## III.   <u>LEGAL ANALYSIS</u>

Hinson's claim alleges facts that constitute an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure.  The United States has waived sovereign immunity and consented to be sued under the provisions of the Clarification Act, 50 App. U.S.C. §1291, which incorporates the consistent provisions of the Suits in Admiralty Act, 46 U.S.C. §30901, *et seq.*  Hinson sued the United States for negligence under the Jones Act, 46 U.S.C. § 30104 *et seq.*  In addition, he asserts that the DENEBOLA was unseaworthy, giving rise

to liability under the general maritime law.

### A.     Jones Act Liability.

The Jones Act provides for recovery by a seaman for personal injuries suffered in the course of his employment; it extends to seamen the same rights accorded railway workers under the Federal Employers Liability Act (FELA).  *Fasold v. Delaware River & Bay Auth.*, 117 F. App'x 836, 837 (3d Cir. 2004).  To prevail under the Jones Act, a plaintiff must prove his employer's negligence through the traditional elements—duty, breach, notice, and causation.  *Id.* at 838.

An employer owes the seaman a duty to provide the seaman with a reasonably safe place to work.  *See Brogan v. United New York Sandy Hook Pilots' Ass'n, Inc.*, 213 F. Supp. 2d 432, 436 (D.N.J. 2002).  As one court recently noted, "there is no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known."  *See e.g., Manu v. United States*, 323 F. Supp. 3d 1346, 1351 (S.D. Ala. 2018).  Although the causation standard in a Jones Act case is relaxed, "it is not no standard at all." *Jones v. United States*, 936 F.3d 318, 323 (5th Cir. 2019).  And the plaintiff must present some evidence to complete "[t]he path from worker injury to employer liability."  *Id.*

### i.   *Hinson's Momentary Inattention Caused his Fall.*

Under the Jones Act, Defendant and Plaintiff are held to the same standard of care.  Both are obligated to act with ordinary prudence.  *See Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1282 (3d Cir. 1995).  At the time of his fall, Hinson had over 35 years of experience working on similar vessels.  During this time, he would have encountered, and stepped over, thousands of coamings, which are on nearly every large vessel.  Seaman are trained to watch for coamings and take care to step over them.  Hinson testified that, throughout

his career, he received training in risk hazard avoidance, including training in slip and fall prevention.  He also acknowledged the presence of coamings on ships, and testified that even with regard to non-watertight doors, "some have [a coaming] and some don't."

Even if Hinson's years of experience had not prepared him to safely exit and enter a room by stepping over the coaming, his experience on the ANTARES certainly prepared him to do so. Hinson had worked in the engine room of the ANTARES for over three months before his fall on the DENEBOLA.  As defense experts will testify, the engine room of the ANTARES is nearly identical to the engine room of the DENEBOLA.  The coaming separating the engine room from the office is the exact same height on both ships.  And, contrary to Hinson's assertion, there is no evidence that the coaming on the ANTARES was marked or painted any differently than the coaming on the DENEBOLA at the time of his fall.

Obviously, Hinson knew about the DENEBOLA's coaming because he successfully stepped over it to enter the office only moments before tripping over it on his way out.  The evidence will show that Hinson was distracted by a routine ship alarm, and fell because he simply did not look down on his way out of the office.  Hinson's injury was due to his momentary inattention, something that can happen to anyone.

ii.    *Hinson Cannot Prove that the United States Acted Negligently.*

There is no evidence that the United States knew or should have known that the coaming, as marked, presented a danger to Hinson or other crewmembers.  Hinson concedes that no government statute or regulation applied to the coaming that would have required the shipowner to paint it yellow or mark it any particular manner.  The DENEBOLA is certified by the U.S. Coast Guard and classed by the American Bureau of Shipping; neither body identified the coaming as a safety hazard during their routine inspections.  Further, there are no records of

6

other trip and fall incidents that would have put the United States on notice of a potential danger posed by the coaming.  Put simply, the United States had no duty to warn Hinson, an experienced mariner, of the coaming by marking it any particular way.

Should the Court find that Hinson's injury was not solely the result of his own negligence, he was at the very least comparatively at fault for his injury.  It is a well-established principle of general maritime law that comparative negligence, although not a complete bar to recovery, will reduce an award by the percentage of the other actor's causative negligence.  *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 407 (1975).  Where a seaman's negligence is a contributing factor in his injury, recovery should be reduced proportionately.  *Ammar v. Am. Exp. Lines, Inc.,* 326 F.2d 955, 959-60 (2d Cir. 1964).  The relaxed standard of causation under the Jones Act also applies to issues of comparative negligence.  *See Norfolk S. Railway Co. v. Sorrell*, 549 U.S. 158, 160 (2007) ("We conclude that the causation standard under FELA should be the same for both [direct and comparative] negligence.").  Consequently, any damages awarded to Hinson must be substantially reduced by his significant comparative fault.

### B.     The DENEBOLA was Seaworthy at all Relevant Times.

The warranty of seaworthiness obligates an owner to furnish a ship, crew, and appurtenances reasonably fit for her intended service, not an accident free ship.  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).  "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service."  *Id.*  "The crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit plaintiff to perform his task aboard the ship with reasonable safety."  *Brogan v. United*

*New York Sandy Hook Pilots' Ass'n, Inc.*, 213 F. Supp. 2d 432, 438 (D.N.J. 2002).  A plaintiff must "show not only that the act or omission played a substantial part in bringing about or actually causing the injury to him, but also that the injury was either a direct result or a reasonably probable consequence of the act or omission."  *Fasold v. Delaware River & Bay Auth.*, 117 F. App'x 836, 838 (3d Cir. 2004).

The coaming, as marked at the time of the incident, was reasonably fit to allow Hinson, or anyone else, to enter the office with reasonable safety.  As noted above, due to the ever-present flood risk, large ships have numerous watertight and semi-watertight doors with coamings of various heights.  Such coamings are necessary to protect internal rooms from water damage.  Here, the white top portion of the coaming contrasted with its red lower portion, drawing attention to its existence.  There is no evidence that anyone else tripped over the coaming or was confused about its height because of the way it was marked.  There is no doubt that a seaman, trained to be vigilant for safety, could enter and exit the room safely with a modicum of attention.  The DENEBOLA was seaworthy in 2016, and remains seaworthy today.

### C.    Hinson has Failed to Mitigate his Damages by Seeking Employment.

Hinson has not worked, or sought work, since his July 7, 2016 discharge from the ANTARES.  Plaintiff has the burden of proving future (post-trial) loss of earnings from a diminished earnings capacity.  *Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir. 1995).  Plaintiff also has a duty to mitigate his damages by pursuing pre- and post-trial employment.  *Id.*  Defense experts will show that Hinson was physically capable of resuming work in his former profession after he completed physical therapy.  They will also show that there are a range of jobs available to him that do not require significant physical activity, including several that would utilize his engineering expertise and pay close to his former

salary.  At the very least, Hinson was capable of returning to lighter duty employment when he completed physical therapy in May of 2017.  Thus, even if the United States were found negligent, at most it is liable for lost wages from the date Hinson was discharged from the ship (July of 2016) until the date he reached maximum medical improvement (May of 2017), a period of less than one year.

## IV. CONCLUSION

The United States is certainly sympathetic about Mr. Hinson's injury.  However, it does not believe it was at fault, nor was the ship unseaworthy.

Dated:  Washington, D.C.
       October 15, 2019                    Respectfully Submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General
                                           Civil Division

                                            *s/ Joshua H. Joseph*
                                           JOSHUA H. JOSEPH
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Torts Branch, Civil Division
                                           PO Box 14271
                                           Washington, DC 20044-4271
                                           Tel: (202) 616-4030
                                           Fax: (202) 616-4002
                                           E-Mail: Joshua.H.Joseph@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua Joseph, Trial Attorney in the Civil Division of the United States Department of

Justice, certify that on October 15, 2019, the foregoing brief was filed and served upon Plaintiff's

counsel via ECF.

Dated: Washington, D.C.
October 15, 2019

 *s/ Joshua H. Joseph*
JOSHUA H. JOSEPH
Trial Attorney
United States Department of Justice
