FRIEDMAN, JAMES & BUCHSBAUM LLP
Andrew V. Buchsbaum (AB-6475)
Attorneys for Plaintiff
21 Kilmer Drive, Suite G
Morganville, NJ   07751

     and

132 Nassau St., Suite 900
New York, NY   10038
t:  (212) 233-9385

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------x

| | | |
|---|---|---|
| ERNEST W. HINSON, Jr, | | Civil Action No: |
| | : | 18-CV-870-BRM-LHG |
| Plaintiff, | | |
| | : | **RETURN DATE: 1/6/20** |
| -against- | | |
| | : | |
| UNITED STATES OF AMERICA, | | |
| | : | |
| Defendant. | | |

-------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S *ORE TENUS* MOTION
FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO
FED.R.CIV.P. 52(c)**

## **Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

A.     Plaintiff proved the "custom and practice" of safety yellow
       thresholds by . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

       (1)     The  accident reports' statements that the "Denebola"
               threshold was not painted "safety yellow" . . . . . . . . . . . . . . . . . . . . . . . .   3

       (2)     The identical threshold on the "Antares" painted
               safety yellow at the time of plaintiff's accident . . . . . . . . . . . . . . . . . . . .   3

       (3)     Plaintiff's testimony as to custom and practice. . . . . . . . . . . . . . . . . . . . .   5

       (4)     Dr. Kenneth Fisher's testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

       (5)     The post-accident re-painting as evidence of defendant's duty. . . . . . . . . .   8

B.     Defendant misstates the standard to prove "custom and practice"
       in the context of a seaman's action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

C.     Plaintiff has proven a *prima facie* case under both the warranty
       of seaworthiness and the Jones Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

       1.     The thresholds's paint scheme gave the impression
              that it was only 1 3/4 inches high, rendering the
              "Denebola" unseaworthy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

       2.     For similar reasons, defendant is liable under the Jones Act . . . . . . . . . . . .   14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

-i-

## Table of Authorities

### Cases

Andrews v. Chemical Carriers, Inc., 457 F.2d 636 (3d Cir. 1972) . . . . . . . . . . . . . . . . . .   10

The Arizona v. Anelich, 298 U.S.110 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Bergman v. Kemp, 97 F.R.D. 413 (W. Dist. Mich. 1983) . . . . . . . . . . . . . . . . . . . . . . . .   9

Brogan v. United New York Sandy Hooks Pilots' Ass'n, 213 F. Supp.2d 432
(D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 15

Costa v. Compagnie Generale Maritime et Financiere, 78 F.3d 592 (9th Cir.),
cert. denied, 517 U.S. 1245 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Crowley v. Sunset Yacht Charters, Inc., No. 10-CV-61928, 2011 WL 2938431
(S.D. Fla. July 19, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

CSX Transp. v. McBride, 564 U.S. 685 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 15

The Dutra Group v. Batterton, __ U.S. ___, 139 S.Ct. 2275 (2019) . . . . . . . . . . . . . . . .12, 15

Enna v. Crescent Towing and Salvage, Co., No. 01-856,
2002 WL 1933725 (E.D. La. Aug. 19, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Evans v. United Arab Shipping Co., 4 F.3d 207 (3d Cir.1993),
cert. denied, 510 U.S. 1116 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Fasold v. Delaware River & Bay Auth., 117 F. App'x 836,
2004 WL 2943974 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Felham Enters.(Cayman) Ltd. v. Certain Underwriters at Lloyds,
02 Civ. 3588, 2005 WL 2050284 at *10 (E.D. La. Aug. 2, 2005) . . . . . . . . . . . . . . . . . .   8

Gutierrez v. Waterman S.S. Corp., 373 U.S. 206 (1963) . . . . . . . . . . . . . . . . . . . . . . . . .   12

Jackson v. OMI Corp., 245 F.3d 525 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Jussila v. M/T Louisiana Brimstone, 691 F.2d 217 (5th Cir. 1982) . . . . . . . . . . . . . . . . .   13

Johnson v. Offshore Express, Inc., 845 F.2d 1347 (5th Cir. 1988) . . . . . . . . . . . . . . .   12, 13

*Kiger v. Doucet & Adams, Inc.*, No. 96-1915, 1998 WL 249221
(E.D. La. May 15, 1998), aff'd, 209 F.3d 719 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kuithe v. Gulf Caribe Mar., Inc.*, No. 08-0458, 2010 WL 3419998
(S.D. Ala.  Aug. 26, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) . . . . . . . . . . . . . . . . . . . . 12

*Martinez v. City of New York*, 684 Fed Appx. 90 (2d Cir. March 29, 2017) . . . . . . . . . . .  8

*Martinez v. United States*, 705 F.2d 658 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960) . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

*Neely v. Club Med Mgmt. Servs.*, 63 F.3d 166 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . .  16

*Oxley v. City of New York*, 923 F.2d 22 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Padilla v. Maersk Line, Ltd.*, 721 F.3d 77 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Quiles v. City of New York*, 978 F. Supp.2d 374 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . .  8

*Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658 (9th Cir. 1997) . . . . . . . . . . . . . . 15

*Rivera v. Kirby Corp.*, No. 17-CV-111, 2019 WL 4051854
(S.D. Tex. Aug. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13

*Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*Sousa v. M/V Caribia*, 360 F. Supp. 971 (D. Mass. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stevens v. Bangor & Aroostock R. Co.*, 97 F.3d 594 (1st Cir. 1996) . . . . . . . . . . . . . . . . .  9

*Tully v. Interlake S.S. Co.*, 02 Civ. 70327, 2007 WL 1174922
(E.D. Mich. Apr. 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Wereb v. Maui County*, 727 F. Supp.2d 898 (D. Hawaii 2010) . . . . . . . . . . . . . . . . . . . . .  9

*Wilburn v. Maritrans GP, Inc.*, 139 F.3d 350 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . .  14, 15

**Statutes, Rules & Regulations**

45 U.S.C. § 51, Federal Employers Liability Act ("FELA") . . . . . . . . . . . . . . . . . . . . . . .  15

46 U.S.C §§ 30104 et seq. (The Jones Act) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 16, 17

Fed.R.Civ.P. 52(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 3, 16

Federal Rule of Evidence 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

**Other Sources**

Merriam-Webster Dictionary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Weinstein's Fed. Evid. § 407.06[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 10

Plaintiff, Ernest W. Hinson, Jr. hereby submits this Memorandum of Law in opposition to defendant's motion (Docket No. 35), which seeks dismissal of plaintiff's action on partial findings pursuant to Fed.R.Civ.P. 52(c).  A discussed below, plaintiff has sufficiently proven a *prima facie* case, and the Court should "decline to render a judgment until the close of the evidence" as permitted by the Rule.  Id.

**Preliminary Statement:**

The partial trial record is replete with proof that defendant failed to provide seaman Hinson a safe place to work by not painting the "Denebola's" threshold safety yellow to contrast with the red deck.[1]  No expert is needed for the Court to find, as would a jury,  that the threshold presented a confusing color pattern indicating its height to be less than actual and that painting the threshold safety yellow would make it much safer.  See Exhibit P-2 in evidence (annexed Exhibit 1).

Defendant's argument that no such custom and practice existed is refuted by its damning post-accident reports which state: **"Door lip in question did not have safety yellow"** (plaintiff's Trial Exhibit P-15 in evidence, annexed Exhibit 2); and "**There was no safety yellow on the lip**" (plaintiff's Exhibit P-12 in evidence, annexed Exhibit 3).  This begs the question- if the use of safety yellow on a threshold was not a custom and practice in the industry, why in the world did experienced mariners- a Chief Mate and a Chief Engineer-- mention it in their signed accident reports?

Moreover, the "Antares" threshold--the "Denebola's" sister ship, was painted safety yellow when Hinson was injured (Exhibit P-4 in evidence, annexed Exhibit 4).  It would

---

[1]Although the terms "coaming," "sill," "lip" and "fish plate" were used to describe the accident locus, for consistency, plaintiff will adopt defendant's usage of "threshold."

strain credulity for defendant to argue that the existing "Denebola" threshold was safer than the "Antares" threshold and the government nowhere remotely even suggests such an absurdity.

Equally compelling is that the "Denebola" threshold was painted safety yellow right after Hinson's fall, which although not offered as proof of negligence or unseaworthiness by itself in contravention of Federal Rule of Evidence 407, does provide proof of defendant's *duty* to provide Hinson a safe place to work, as discussed below.

The testimony of plaintiff's maritime expert Dr. Kenneth Fisher proves that the threshold presented a confusing color pattern and that the existing color scheme was contrary to accepted maritime custom and practice.  Specifically, Dr. Fisher testified that the threshold as painted gave the impression that it was only 1 3/4 inches high, rather than 6 1/4 inches.  He admitted that no rule, regulation or statute specifically required this particular  threshold to be painted yellow, but that custom and practice in the industry as well as other regulations (including those promulgated by the Coast Guard and Navy which the Court may consider– see Point A(4), infra) dictated that such a paint scheme be used.

Additionally, any fault of plaintiff can be addressed by the Court in a finding of comparative fault, tempered by the fact that plaintiff was responding to a ship's alarm when he crossed and tripped over the unsafe threshold.  Defendant's suggestion that the Court would be required to craft a rule requiring *all* thresholds to be painted yellow of course need not be considered, only that this particular threshold on this particular ship at this particular time was unsafe as painted when Hinson was undeniably hurt.

In sum, the foregoing facts provide more than sufficient proof of a custom and practice in the industry of painting such a threshold safety yellow to contrast with the deck,  and

that the existing threshold was dangerous and unsafe.  At the very least, the Court should "decline to render any judgment until the close of the evidence" as permitted by Fed.R.Civ.P. 52(c).

**A.**    **Plaintiff proved the "custom and practice" of safety yellow thresholds by:  (1) The accident reports' statements that the "Denebola" threshold was not painted "safety yellow;" (2) The identical threshold on the "Antares" painted safety yellow at the time of plaintiff's accident; (3) Plaintiff's own testimony; (4) The testimony of Plaintiff's maritime expert Dr. Kenneth Fisher; and (5) The subsequent yellow re-painting of the threshold.**

      **1.**    <u>**The accident reports blame lack of "safety yellow":**</u>

In three official signed accident reports, the lack of "safety yellow" on the threshold was highlighted.

**Trial Exhibit P-15 (annexed Exhibit 2):**  Entitled "Report of Investigation of Serious Illness/Injury," admitted without objection and stipulated as a business record, is an official U.S. Department of Transportation Maritime Administration form signed by "Antares" Chief Mate Michael Rawlins and Chief Engineer Robert Bailey.  Trial Transcript at 41:5-12. Below the pre-printed section captioned

      **"Condition of accident scene at time of investigation,"**

is handwritten

      **"Door lip in question did not have safety yellow."**

<u>Id</u>.; annexed Exhibit 2.[2]

**Trial Exhibit P-12 (annexed Exhibit 3):**  "Tote Services Inc. Statement of Person Claiming Injury" was also admitted without objection.  Trial Transcript 39:4-9.  Next

---

    [2]The observation "Door lip in question did not have safety yellow" can in no way be deemed a subsequent remedial measure.

to pre-printed

> **WAS THE CONDITION OF ANY OF THE FOLLOWING INVOLVED AS A FACTOR AT THE TIME: WEATHER, SEA, WORK AREA, DECK, LIGHTING, TOOLS OR EQUIPMENT?:**
> was handwritten by Chief Mate Mike Rawlins:

> **Deck Area. There was no safety yellow on the lip.**

Trial Transcript 37:13-38:4.[3]

> **Trial Exhibit P-18 (annexed Exhibit 5):** A "Department of Homeland Security U.S. Coast Guard Report of Marine Casualty," admitted without objection and signed by Chief Mate Michael Rawlins, notes, by inference, that the threshold was not painted "safety yellow" when Hinson fell. Trial Transcript 42:15-20.[4]

> **2.** **The safety yellow on the "Antares" threshold:**

> Hinson testified that the threshold on the "Antares," the vessel upon which he

primarily was assigned, was painted yellow on and before the date of his accident:

> Q [Mr. Buchsbaum]: Let's talk about the Antares. Was there a similar room on the Antares where you were primarily assigned?

> A [Mr. Hinson]: Similar room, yes.

> Q. Do you remember what the sill looked like on the Antares?

> A.. No, I don't remember that.

> Q. All right. Let me show you what's been marked as P-4, which is part of defendant's expert's report. And do you see where the cursor, the little cross is located?

---

[3]Similarly, the phrase "[t]here was no safety yellow on the lip" cannot be deemed a subsequent remedial measure.

[4]By referring the Court to Exhibit P-18, plaintiff does not seek to introduce evidence of a subsequent remedial measure but merely to show use of "safety yellow" as a custom and practice in the industry.

A. Yes.

Q. That's been represented by the defendant's expert to be the sill on the Antares. Do you see that?

A. Yes.

Q. Was that the condition and color of the sill on the Antares on and before the date of your accident on the Denebola?

A. Yes.[5]

Trial Transcript at 32:10-25.

### 3.    Plaintiff's testimony as to custom and practice:

Q [Mr. Buchsbaum]:  Now, in your experience, since sailing on vessels since approximately 1976, are these sills, lips, coamings, whatever you want to call it, similar to Exhibit-2, are they painted any different color?

A [Mr. Hinson]: Yes, they are.

Q. What color?

A. They usually paint it safety yellow and black.

Trial Transcript 32:1-7.

Defendant objects to plaintiff's use of the word "usually," suggesting without any support whatsoever that "'usually' does not make a maritime custom or standard of care." Defendant's Memorandum at 10-11.  As discussed below at Point B, this wrong.  Defendant also proves the validity of plaintiff's testimony by noting that as a marine engineer, "he is well familiar with the procedures for painting a marine engine room."  Id. at 11.

---

[5]Hinson testified at his July 27, 2018 deposition that he did not remember the color of the "Antares" coaming; however, when shown a photograph of the "Antares" coaming contained in defendant's maritime expert's report generated after his deposition, it refreshed his recollection as to the color.  Trial Transcript at 67:19-68:18.

4.      **Dr. Kenneth Fisher's testimony**:

For 43 years, Dr. Fisher has been employed by Fisher Maritime Consulting Group, consulting naval architects, marine engineers and project managers.  Trial Transcript 79:19-80:2.  The Court noted that Dr. Fisher's qualifications were "extensive and impressive." Id. at 80:11-16.  The Court also stated:

> Just for the record, I am satisfied that the witness is qualified to render opinions in the area of ship design, paint schemes, including colors, and human factors.

Trial Transcript 98:22-25.

Dr. Fisher boarded the "Denebola" on November 1, 2018 and inspected and measured the threshold, noting that the 6 1/4 inch high threshold was painted the same color of the deck for 4 ½ inches up from the deck, with the remaining 1 3/4 inches painted white.  Trial Transcript at  93:13-15; 93:23-94:4; 94:18-96:3.

Dr. Fisher testified that this color scheme was unsafe:

Q [Mr. Buchsbaum]: Dr. Fisher, again, is this a safe color scheme as shown in Exhibit-4 in your report for that sill?

A [Dr. Fisher]: Let me put it this way. It is not safe if you accept the other standards, the standards which talk about sill colors.  If you accept them as representing safe according to human factor's experts, then this is definitely not safe.

Q. Why is it not safe?

A. The standards to which I refer talk about all of them --I mean both of them in the U.S. talk about having stripes, diagonal or vertical stripes to make it much more attention-getting. So it's very easily identified for the full height of the sill to be alternating colors so that clearly the full height of the sill is appreciated from anybody approaching it.

\*            \*            \*

> [N]ot only was he denied the opportunity, but he was given what, to me, looks to be misrepresentation because a quick glance at it, when you're walking and you quickly glance at it, perhaps, okay, but if he did quickly glance at it, then he would have thought that the sill was only one-and-three quarters inch in height or thereabouts, not a full six-and-a-quarter inches. So he is first denied the opportunity to see a safe looking sill in the paint scheme. Second, then he was given a misleading skill -- a misleading paint scheme, rather.

Trial Transcript 99:7-20; 105:2-11.

Dr. Fisher admitted that no standards specifically applied to marking the "Denebola" threshold.  Nonetheless, he cited to Navy and Coast Guard standards (Trial Transcript at 100:14-101:9) which applied to their vessels as further evidence of custom and practice in the *industry* "because the expectation is that industry custom and practice will follow the lead of the Navy and the Coast Guard for their own ships."  Trial Transcript at 120:19-21; see also 99:7-20.  Whether or not Dr. Fisher ever actually served in the Navy or Coast Guard (he did not) is of no moment given the import of his testimony, which was that those standards are relevant to determining an industry standard of care for thresholds.  Practically speaking, there is absolutely no reason why Hinson, serving aboard a Maritime Administration ready-reserve vessel, is entitled to any lower standard of care than Coast Guard and Navy personnel.

The use of non-binding industry standards to determine custom and practice was discussed in Crowley v. Sunset Yacht Charters, Inc., No. 10-CV-61928, 2011 WL 2938431 (S.D. Fla. July 19, 2011), where the court stated:

> The fact that they [American Boat and Yacht Council standards] are not binding does not render the guidelines irrelevant. Mr. Allen [plaintiff's maritime expert] merely includes the guidelines as a reference to the industry standard he uses in his opinion. As Plaintiff states, "It is proper for an expert to provide expert testimony as to what violates *an industry standard* in support of his opinion that there was [an] inherent seaworthiness condition aboard a Vessel.  This is exactly what Mr. Allen has done with regard to his use of the ABYC guidelines vis-à-vis the lack of handrails on the coach roof steps." Resp. at 10. The Court agrees.

–7–

Id. at *3.  Accordingly, the Coast Guard and Navy standards cited by Dr. Fisher are properly considered by the Court as industry standards relevant to determining custom and practice here.

The Court should also note that Dr. Fisher's testimony has been relied upon by other courts when determining industry custom and practice.  See, e.g., Martinez v. City of New York, 684 Fed Appx. 90 (2d Cir. March 29, 2017) ("Were the jury to credit Martinez's expert [Dr. Fisher] as to both the insufficiency of the afforded handholds and the industry custom to install dedicated handholds, it could  find that the ladder was not reasonably safe."); Quiles v. City of New York, 978 F. Supp.2d 374, 385-86 (S.D.N.Y. 2013) ("According to Dr. Fisher, had the City complied with standard industry custom and practice by installing a cutout in the collar and gunwale of the Moose Boat or having portable steps on the dock, Quiles could have disembarked without risking an injury."); see also Tully v. Interlake S.S. Co., 02 Civ. 70327, 2007 WL 1174922 at *20 (E.D. Mich. Apr. 20, 2007) ("The Court finds Fisher's testimony on the 3M non-skid pad the better argument in that diamond plating would have contributed to a more slippery surface than the 3M non-skid pad."); Felham Enters. (Cayman) Ltd. v. Certain Underwriters at Lloyds, 02 Civ. 3588, 2005 WL 2050284 at *10 (E.D. La. Aug. 2, 2005) ("The Court was impressed with Dr. Fisher's extensive knowledge of naval architecture and his attention to detail with regard to the analysis of the [vessel], specifically with regard to any discrepancies or modifications necessary for the vessel to achieve stability and/or meet Lloyd's stability criteria.").

**5.** **The post-accident re-painting as evidence of defendant's duty:**

The photograph depicting "Denebola's" yellow-painted threshold (Exhibit P-4 in evidence, annexed Exhibit 4) is admissible to demonstrate the *existence* of a duty, standard

of care and/or custom and practice in the industry– of safety yellow on thresholds to contrast

with the deck.[6]  Plaintiff does not proffer the photograph to demonstrate negligence or any other

excludable reason under F.R.E. 407 ("Subsequent Remedial Measures"), which provides as

follows:

> When measures are taken that would have made an earlier injury or harm less
> likely to occur, evidence of the subsequent measures is not admissible to prove:
> negligence; culpable conduct; a defect in a product or its design; or a need for
> a warning or instruction.  But the court may admit this evidence for another
> purpose, such as impeachment or — if disputed — proving ownership, control,
> or the feasibility of precautionary measures.

The Advisory Committee's Notes to Rule 407 state that a permissible use of a

subsequent remedial measure includes proof of a party's "duty:"

> The second sentence of the rule directs attention to the limitations of the rule.
> Exclusion is called for only when the evidence of subsequent remedial measures
> is offered as proof of negligence or culpable conduct.   In effect it rejects the
> suggested inference that fault is admitted.   Other purposes are, however,
> allowable, including ownership or control, **existence of duty**, and feasability of
> precautionary measures, if controverted, and impeachment (emphasis added).

See, e.g., Stevens v. Bangor & Aroostock R. Co., 97 F.3d 594, 598 (1st Cir. 1996) (in a FELA

case, a post-accident photograph "was properly admitted to show the Railroad's past practice

and standard of care."); Bergman v. Kemp, 97 F.R.D. 413, 418 (W. Dist. Mich. 1983) ("Finally,

as recognized by the Advisory Committee on Proposed Rules, subsequent remedial measures

are admissible to demonstrate the existence of duty; an issue which is critical to this

litigation."); Wereb v. Maui County, 727 F. Supp.2d 898, 919 n.13 (D. Hawaii 2010).[7]

---

[6]Exhibit P-4 was admitted in its entirety without objection.  Trial Transcript at
35:8-36:6.

[7]A leading commentator has suggested that before admitting evidence of a
subsequent remedial measure to show the existence of duty, "the trial judge should be

–9–

**B.** **Defendant misstates the standard to prove "custom and practice" in the context of a seaman's action.**

Defendant posits an unduly restrictive and rigid definition of "custom and practice," essentially arguing that plaintiff must present proof that every single threshold on every single vessel is painted yellow to be considered the custom and practice in the industry. Such an argument is nonsensical on its face. Rather, the very terms used—"custom" and "practice"—mean "a usage or practice *common* to many" and "to do or perform *often*, *customarily*, or *habitually*," respectively. <u>See</u> Merriam-Webster, https://www.merriam-webster.com/dictionary/custom; *Practice*, Merriam-Webster, https://www.merriam-webster.com/dictionary/practice (emphasis added). <u>See also</u> <u>Andrews v. Chemical Carriers, Inc.</u>, 457 F.2d 636, 638-39 (3d Cir. 1972) ("Although ***in most cases*** the vacancy created by a mate's vacation would not be filled and the S. S. Chemical Transporter would normally carry three mates (including the chief mate), there was evidence to support the district court's finding that on the voyage into drydock in preparation for the annual inspection of the tanks by shipyard officials, it was the established custom and practice in the coastal trade for a vessel to carry all four mates (the normal complement) because of the extra work involved in supervising the tank cleaning operations carried out by the crew. (emphasis added); <u>Padilla v. Maersk Line, Ltd.</u>, 721 F.3d 77, 82 (2d Cir. 2013) ("The record reflects that it was the custom and practice for seafarers working for Maersk to derive substantial income from overtime compensation and that, consequently, such compensation was a ***common expectation*** of both the seamen and of

---

satisfied that the need for such evidence is substantial, that the issue is actually in dispute, and that the plaintiff's need outweighs the danger of its misuse by the jury." Weinstein's Fed. Evid. § 407.06[3]. Plaintiff submits that those standards are satisfied here to allow the Court to consider the re-painting for this limited purpose.

Maersk. (emphasis added); <u>Brogan v. United New York Sandy Hooks Pilots' Ass'n</u>, 213 F. Supp.2d 432, 434 (D.N.J. 2002) ("These boardings are ***often*** done while the ship and motorboat are moving. Once the pilot is safely aboard the ship, it is custom and practice for the deckhand to pass the bag to the ship by attaching the pilot's bag to a heaving line (kept at the boarding gate of the ship being boarded").

**C.      Plaintiff has proven a *prima facie* case under both the warranty of seaworthiness and the Jones Act:**

**1.      The thresholds's paint scheme gave the impression that it was only 1 3/4 inches high, rendering the "Denebola" unseaworthy:**

Dr. Fisher testified that the paint scheme on the Denebola's threshold gave the impression that it was only 1 3/4 inches high--this is obvious from even a cursory review of Exhibit P-2 (Annexed Exhibit 1).  Plaintiff testified that he tripped over the white portion of the threshold.  This dangerous and defective condition of the coaming- creating optical confusion based on the confusing color pattern, renders the vessel unseaworthy.  This is especially so given the repeated references to the lack of "safety yellow" on the threshold in the accident reports.

A shipowner's liability for failure to furnish a seaworthy vessel is a species of liability <u>without</u> <u>fault</u> and is not limited by conceptions of negligence.  That is, seaworthiness is "essentially a species of liability without fault . . .  neither limited by conceptions of negligence nor contractual in character. It is a form of absolute duty owing to all within the range of its humanitarian policy."  <u>Seas Shipping Co. v. Sieracki</u>, 328 U.S. 85, 94–95 (1946) (citations omitted).   Moreover, "the decisions of this Court have undeviatingly reflected an understanding that the owner's duty to furnish a seaworthy ship is absolute and completely

independent of his duty under the Jones Act to exercise reasonable care." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960) (cited in The Dutra Group v. Batterton, __ U.S. ___, 139 S.Ct. 2275, 2285 (2019)).  Under general maritime law, unseaworthiness is a claim "based on the vessel owner's duty to ensure the vessel is reasonably fit to be at sea." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001).  Strict liability attaches to a shipowner for injuries caused by the vessel's unseaworthy condition. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960). While a shipowner is not "obligated to furnish an accident-free ship," the ship owner does have a duty to "to furnish a vessel and appurtenances reasonably fit for their intended use." Id. at 550.  "Liability for unseaworthiness does not depend either on negligence, or on notice." Martinez v. United States, 705 F.2d 658, 660 (2d Cir. 1983) (citations omitted). To prevail on a claim of unseaworthiness, a plaintiff must establish that a vessel was insufficiently or defectively equipped, and that his or her injuries resulted from the unseaworthy condition of the vessel. Oxley v. City of New York, 923 F.2d 22, 26 (2d Cir. 1991).

In Rivera v. Kirby Corp., No. 17-CV-111, 2019 WL 4051854 (S.D. Tex. Aug. 28, 2019), "[t]he edges of the hatch cover were not marked and were not painted in a color contrasting the color of the deck."  Id. at * 2.  Plaintiff Rivera tripped over the 1 ½ inch raised edge and was injured.  Id.  In finding the vessel unseaworthy, the Rivera court stated:

> Captain Rivera's unseaworthiness claim is meritorious. A shipowner has an absolute duty to provide a seaworthy vessel. Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir. 1988). "[T]he seaworthiness doctrine . . . is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 213 (1963). To prevail on an unseaworthiness cause of action, then, the plaintiff must prove that the shipowner "has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used." Jackson v. OMI Corp., 245 F.3d 525, 527 (5th Cir. 2001). The plaintiff must also establish that the "unseaworthy condition

-12-

played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." <u>Johnson</u>, 845 F.2d at 1354. "[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability.... What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence." <u>Mitchell v. Trawler Racer, Inc.</u>, 362 U.S. 539, 549–50 (1960). Trip hazards in walkways can render a vessel unseaworthy. See, e.g., <u>Sousa v. M/V Caribia</u>, 360 F. Supp. 971, 976 (D. Mass. 1973) (finding, in a case in which the plaintiff had tripped on a raised hatch cover lifting ring while carrying a carton of frozen fish, that the raised lifting ring had rendered the deck of the vessel's hold unfit for the purpose of discharging cargo); <u>Jussila v. M/T Louisiana Brimstone</u>, 691 F.2d 217, 218–20 (5th Cir. 1982) (holding, in a case in which the plaintiff had tripped on a metal rim protruding vertically from the deck of a vessel, that the plaintiff created a fact question as to unseaworthiness by presenting an expert who testified that the vessel owner had violated industry custom by not painting the metal rim with white or luminous paint). Captain Rivera has met his burden of proof. Kirby and the Tarpon's crew violated industry customs and standards and created an unsafe condition when they failed to mark or repair the hatch cover on which Captain Rivera broke his foot.

<u>See also</u> <u>Costa v. Compagnie Generale Maritime et Financiere</u>, 78 F.3d 592 (9th Cir.), <u>cert.</u> <u>denied</u>, 517 U.S. 1245 (1996) (issue of fact as to negligence created by defendant shipowner's failure to paint raised coaming "a contrasting color to the deck . . . ."); <u>Enna v. Crescent Towing</u> <u>and Salvage, Co.</u>, No. 01-856, 2002 WL 1933725 at *4 (E.D. La. Aug. 19, 2002) ("[T]here remain material issues of fact as to whether sheer height of the coaming made the vessel unsafe and whether any negligence on the plaintiff's part contributed to the accident in question.").[8]

_____

[8]In <u>Kiger v. Doucet & Adams, Inc.</u>, No. 96-1915, 1998 WL 249221 (E.D. La. May 15, 1998), <u>aff'd</u>, 209 F.3d 719 (5th Cir. 2000), a seaman's trip and fall over a raised "lip" was dismissed, but importantly, and unlike the case at bar, the lip was painted yellow to distinguish it from the surrounding deck:  "The lip which could be a tripping hazard was painted in the regulation yellow to signal danger. . . . Plaintiff also testified that the lip was painted yellow so that it would be more visible." <u>Id.</u> at *2.

2.      **For similar reasons, defendant is liable under the Jones Act**:

Defendant had a duty to provide Hinson with a safe place to work.  That duty was breached, as recognized by Chief Mate Michael Rawlins and Chief Engineer Robert Bailey, both of whom noted in official post-accident reports that the subject threshold was not painted "safety yellow."  See Point A, supra.  Defendant should have known of the danger given that the threshold on sister ship "Antares" was painted safety yellow.

The Jones Act is liberally construed to accomplish its beneficent purposes:

> The legislation [The Jones Act] was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty. Its purpose was to enlarge that protection, not to narrow it.  Its provisions, like others of the Merchant Marine Act, of which it is a part, are to be liberally construed to attain that end, and are to be interpreted in harmony with the established doctrine of maritime law of which it is an integral part.

The Arizona v. Anelich, 298 U.S.110 (1936).

Courts have refused to give Jones Act "negligence" a narrow, technical and restricted meaning.  Thus, the Jones Act, which incorporates the Federal Employer's Liability Act, 45 U.S.C. § 51 ("FELA"), makes the employer liable to its employees for an injury "resulting ***in whole or in part*** from the negligence of any of the officers, agents, or employees of such carrier."  45 U.S.C. § 51 (emphasis and italics added).  As compared to a common law negligence actions, the standard of proof for causation under the Jones Act is relaxed, sometimes termed "featherweight."  See Wilburn v. Maritrans GP, Inc., 139 F.3d 350, 356-57 (3d Cir. 1998); Evans v. United Arab Shipping Co., 4 F.3d 207, 210 (3d Cir.1993), cert. denied, 510 U.S. 1116 (1994).  In CSX Transp. v. McBride, 564 U.S. 685 (2011), the Supreme Court re-affirmed the liberal negligence standard under the Jones Act, holding that liability is

established if "[d]efendant's negligence played a part—no matter how small—in bringing about the injury."[9]

The elements of a Jones Act negligence claim are: duty, breach of duty, notice and causation. A vessel owner owes a seaman a duty under the Jones Act to provide a safe place to work:

> The duty of the vessel owner to furnish a reasonably safe place for a seaman ... to perform his chores is clearly a duty of care, the breach of which results in liability for negligence. . . . Under the Jones Act, an employer is liable for injury suffered by a seaman through the negligence of the employer or a fellow employee. As the district court instructed the jury, "negligence requires the defendant to guard against those risks or dangers of which it knew, or by the exercise of due care, should have known. . . . [T]he defendant's duty is measured by what a reasonably prudent person would anticipate or foresee resulting from particular circumstances." The standard of proof for causation is relaxed in cases filed pursuant to the Jones Act. Causation is satisfied if the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury. . . .

Wilburn, supra, 139 F.3d at 356-57 (quotations and citations omitted); see also Brogan v. United New York Sandy Hook Pilots' Ass'n, 213 F. Supp.2d 432, 436 (D.N.J. 2002). Constructive notice satisfies the Jones Act, - i.e. that defendant "in the exercise of reasonable care . . . ought to have known about or discovered the alleged dangerous conditions . . . ." Ribitzki v. Canmar Reading & Bates, Ltd..111 F.3d 658 (9th Cir. 1997) (cited in Brogan, supra).

---

[9]McBride was decided pursuant to the FELA, which governs actions by injured railroad workers but which standards are equally applicable to Jones Act as recited in the Jones Act itself (46 U.S.C. § 30104) and as recognized by caselaw. See, e.g., The Dutra Group v. Batterton, __ U.S. __, 139 S.Ct. 2275, 2281 (2019) ("Rather than create a new structure of substantive rights, the Jones Act incorporated the rights provided to railway workers under the Federal Employers' Liability Act . . . ."); Fasold v. Delaware River & Bay Auth., 117 F. App'x 836, 2004 WL 2943974 (3d Cir. 2004) ("The Jones Act provides for recovery by a seaman or woman for personal injuries suffered in the course of his or her employment in an action at law; it extends to seamen and women the same rights accorded railway workers under the Federal Employers Liability Act ("FELA")).

3.      **Plaintiff's comparative fault, if any, is no bar to recovery:**

Defendant makes much ado of Hinson's purported failure to look where he was going- a classic argument of comparative fault, failing to even mention the fact that Hinson was responding to an alarm on the "Denebola," a vessel with which he was generally unfamiliar. Any such fault on plaintiff does not defeat his *prima facie* case, but merely may serve as a finding of comparative fault applicable in a seaman's personal injury case.  See, e.g., Neely v. Club Med Mgmt. Servs., 63 F.3d 166, 199 & n.37 (3d Cir. 1995); Kuithe v. Gulf Caribe Mar., Inc., No. 08-0458, 2010 WL 3419998 at *4 (S.D. Ala.  Aug. 26, 2010) ("Under maritime law, the comparative negligence of a plaintiff applies equally to both theories of recovery [Jones Act negligence and unseaworthiness]. . . .  In either circumstance, a plaintiff's contributory negligence will not bar his recovery, but will reduce his damage award." (citations omitted)).

## Conclusion

For the reasons stated above, defendant's motion should be denied, and the Court should "decline to render a judgment until the close of the evidence" as permitted by Fed.R.Civ.P. 52(c), in plaintiff's favor.

Dated: December 9, 2019

FRIEDMAN, JAMES & BUCHSBAUM LLP
Attorneys for Plaintiff

By:

_____/s/ Andrew V. Buchsbaum_____
Andrew V. Buchsbaum (AB-6475)

-16-